# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARTHA L. JOHNSON,** | : | **No. 3:04cv2504** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JOANNE B. BARNHART,** *Commissioner* | : | |
| *of Social Security,* | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Presently before the Court for disposition is Plaintiff Martha L. Johnson's objection to Magistrate Judge Thomas M. Blewitt's Report and Recommendation. The Report and Recommendation proposes that we grant Johnson's appeal of Defendant Commissioner Joanne B. Barnhart's decision to deny Johnson's claim for Disability Insurance Benefits under Title II of the Social Security Act ("Act") 42 U.S.C. §§ 401-33. Magistrate Judge Blewitt found that Defendant failed to consider the appropriate time period in the disability determination and recommends that we remand the case to Defendant for further proceedings. Johnson argues that remand is inappropriate, and we should direct Defendant to award benefits. The parties have fully briefed this matter and it is ripe for disposition. For the reasons that follow, we will sustain Johnson's objection.

## I.    Background

### A.    Medical History

Martha Johnson was born August 10, 1930. (R. 138) She worked in a variety of positions from 1942 until September 1979, when she injured her right arm working for Teledyne McKay as a chain polisher. (R. 79, 168, 434) Shortly after her injury, she visited

her family doctor and complained of pain near her elbow when gripping and carrying.  (R. 228)  In January 1980, she began treatment with Dr. Vincent Butera for problems with her right hand, wrist, elbow, and shoulder.  (R. 248-55)  Dr. Butera initially medicated her with Tolectin, and treated her with two wrist injections and splinting in January through February 1980.  (R. 255)   On February 29, he diagnosed her with de Quervain's disease[1] upon performing a positive Finkelstein test.[2]  (R. 255)

On March 18, 1980, Dr. Butera performed an outpatient surgical procedure to decompress the first extensor compartment of Johnson's right wrist.  (R. 238)  He opened the compartment in her wrist until the tendons could glide without difficulty.  (Id.)  Ten days later, Johnson reported that the pain in her thumb had improved, but she still had pain in her right elbow.  (R. 254)  On April 8, Dr. Butera examined Johnson and found that the pain and tenderness of her radial styloid had subsided, but she still had some pain in her thumb and had pain and hyper-sensitivity in her lateral and medial epicondyle.[3]  (Id.)  She had full abduction of the thumb without pain, slight limitation of movement in her wrist, and Finkelstein's test was negative.  (Id.)  Dr. Burera felt that she still had problems with the region of her lateral epicondyle.  (Id.)

---

[1] De Quervain's disease is also known as de Quervain's tendinitis, and is defined as "fibrosis of the sheath of a tendon of the thumb."  STEADMAN'S MEDICAL DICTIONARY 513 (27th ed. 2000).

[2] Finkelstein's test is the passive flexion of thumb tendons.  If the examinee has dorsal thumb pain during flexion, it indicates de Quervain's disease.  Family Practice Notebook, Finkelstein's Test, http://www.fpnotebook.com/ORT76.htm (last visited Feb. 23, 2006).

[3] Epicondyle: "an eminence upon a bone, above its condyle."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 625 (30th ed. 2003).  Condyle: "a rounded projection of a bone."  Id. at 406.

On May 5, 1980, her elbow condition had not improved, and she still had pain in her forearm. (Id.) She had tenderness around her elbow and pain with resisted dorsiflexion[4] of the wrist. (Id.) She had full abduction of her thumb and her Finkelstein test again was negative. (Id.) In July, she continued to have elbow pain, and in September, she had pain in her elbow and wrist. (R. 253). During the September visit, Johnson complained that she could not lift, and Dr. Butera agreed, finding that she had significant weakness of grip and pinch strength. (Id.) In November 1980, Dr. Butera received a letter from a Dr. Schneider explaining that Johnson possibly suffered from carpel tunnel syndrome, and this diagnosis was supported by nerve conduction tests. (Id.) Thus, Dr. Butera discussed the possibility of a carpal tunnel decompression procedure. (Id.) In January 1981, Johnson complained of pain in her wrist radiating into her fingers, and her elbow pain had not improved. (Id). She tested positive for Tinel's[5] sign and Phalen's maneuver[6] evinced carpal tunnel syndrome at the wrist. (Id.) Dr. Butera scheduled Johnson for surgery. (Id.)

On February 3, 1981, Johnson underwent a right carpal tunnel decompression. (R.

---

[4] "Dorsiflexion: flexion or bending toward the extensor aspect of a limb, as of the hand or foot." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 560.

[5] Tinel's Sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1703.

[6] Phelan's Manuever: "(for detection of carpal tunnel syndrome), the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds). DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1094.

252, 236)  During surgery, Dr. Butera found a marked amount of synovial reaction[7] in the carpel tunnel and found the nerve flattened and hyperemic.[8]  (R. 236)  Ten days after the surgery, Johnson complained that the pain in her arm had not improved.  (R. 252)  Dr. Butera opined that her arm should improve because he identified and corrected her pathology during surgery.  (Id.)

On March 6, 1981, Johnson reported that the pain and numbness in her hand had decreased, but she continued to have pain in her thumb that restricted her use of the digit. (Id.)  Dr. Butera found pain in her thumb on resisted flexion, extension, and pinching.  (Id.) He opined that her pain was mainly related to de Quervain's tendinitis, and suggested that she use her hand to tolerance.  (Id.)

On April 17, 1981, upon reexamination, Dr. Butera again suggested she use her hand to tolerance, and found no swelling, some aching in the hand, but overall she had good use of the hand.  (Id.)  He also reviewed her employment status, and found that she could perform light work that did not require heavy lifting or straining.  (R. 372)  Thus, he suggested that she work as a home health aid.  (Id.)  She performed this job for three moths until pain in her right arm forced her to stop.  (R. 156)

On December 11, 1981, Johnson continued to have pain in her elbow and arm, but had full motion of all joints, and the pain occurred on the extremes of motion.  (R. 251-52)  Dr.

---

[7]  Synovia: "a transparent alkaline viscid fluid, resembling the white of an egg, secreted by the synovial membrane, and contained in joint cavities, bursae, and tendon sheaths." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1839.

[8] Hypermia: "an increase of blood in a part." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 881.

Butera again suggested she use the arm to tolerance, but explained she should avoid lifting and pulling. (R. 251)

During another follow up visit on May 28, 1982, Johnson explained that she could use her hand moderately, but she could not make a clenched fist. (Id.) She had good motion of the wrist and good passive motion of her fingers. (Id.) By January 13, 1983, Johnson's situation still had not changed. (Id.) She had pain in her hand, she had trouble using her hand, and she found it to be very weak. (Id.) She had full motion of the wrist and fingers but grip and pinch strength was very weak. (Id.)

On October 14, 1983, Johnson complained of pain in her right shoulder. (Id.) Dr. Butera found no stiffness or muscle wasting, but did find generalized weakness of her right arm. (Id.) She explained that she had used her arm fairly vigorously in caring for her husband, who had recently died. (Id.) Dr. Butera found some tenderness in the shoulder, but Johnson did not suffer pain on stressing the rotator cuff or the biceps brachii. (Id.) Grip strength was very weak and there was minimal tenderness in the wrist. (Id.) X-rays of the shoulder revealed no bone or soft tissue abnormality. (R. 250) Dr. Butera administered a Decadron L/A and Xylocaine injection. (Id.) He concluded that her weakness and limitations in her right arm were permanent and she could not perform heavy lifting or pulling. (Id.) He did, however, opine that she could perform light work. (Id.)

Dr. Mulligan, Johnson's family practitioner, treated Johnson regularly for a variety of ailments after the onset of her injury, but he was not involved in the diagnosis and treatment of the injury itself, as Dr. Butera was the specialist who oversaw this aspect of Johnson's

health care.  (R. 224, 311-18)  Dr. Milligan did examine her regularly for other ailments

from 1982 through 1990, and on occasion noted that her arm was causing her pain.  (R. 311-

18)  He frequently observed that Johnson was "doing well."  (R. 318)  In November 1983, he

reported that Johnson could move her arm well but had pain while lifting heavy objects or

opening jars.  (R. 317)  On December 6, 1983, he observed that she had little tenderness and

good strength in her right arm, but had discomfort when flexing her arm against resistence.

(Id.)

On December 12, 1983, Dr. Mulligan reported that Johnson's elbow impairment was

"relatively chronic tendonitis of the right elbow, which will probably offer her similar

symptoms over a long period of time with various times of increasing pain and other times

where she is able to have less pain.  She appears to have good function of the elbow except

as her description is that it's worse with pain."  (R. 182)

On June 20, 1984, Dr. Butera examined Johnson and found no change in his previous

diagnosis.  (R. 250)  She had some tenderness and pain, but he suggested that she use her arm

to the extent that she could tolerate the pain, but she could not perform any heavy work.  (Id.)

 He also noted, "the possibility of some reflex sympathetic dystrophy again was mentioned."

(Id.)

On February 26, 1986, Johnson returned to Dr. Butera complaining of constant pain

and weakness in her right arm.  (R. 249)  Dr. Butera found that she had full range of motion

of all of her joints in her right arm, she was able to make a full fist, had vague tenderness,

and had no pain on resisted dorsiflexion of the wrist.  (Id.)  He found no evidence of Tinel's

sign, and her Phelan's test was negative.  (Id.)  He opined that she had chronic tendinitis,

which was a condition that had not changed.  (Id.)  He stated that she was permanently

disabled for heavy use of her right arm.  (Id.)

On March 4, 1987, Dr. Butera examined Johnson and found full range of motion in

her right elbow, wrist, and hand, and somewhat diminished grip strength.  (Id.)  He again

found no objective support for her complaints.  (Id.)

On November 6, 1987, Dr. Butera found that Johnson had thickening of her flexor

sheath, and he suggested that she receive a steroid injection, although Johnson declined this

treatment.  (R. 248)  On November 11, 1987, Dr. Butera found Johnson "exquisitely" tender,

and opined that she suffered from chronic tendinitis.  (Id.)  He suggested that a rehab

specialist could have been helpful.  (Id.)

### B.    Employment History

Immediately prior to the onset of her injury, Johnson worked as a chain polisher.  She

held this job from 1978 to 1979.  (R. 174)  From 1972 to 1978, she worked as a bander,

stamper, and sponger for a pottery company.  (Id.)  From 1970 to 1972, she worked as a cook

helper and dishwasher for a cigar factory and a country club.  (Id.)  From 1968 to 1970 she

was an examiner for a clothing manufacturer.  (Id.)

### C.    Procedural History

Johnson twice filed to recover social security benefits based on the condition of her

right arm, first on October 20, 1983 and then again on December 10, 1990.  Each time she

alleged her disability began on in September 1979.  Each time, she was denied.  Presently

before the Court is her October 20, 1983 application.   This claim was initially denied on

December 19, 1983, but was reopened pursuant to Bailey v. Sullivan, No.CIV.A.83-1797,

1991 WL 207484, at *6 (M.D. Pa. July 29, 1991) because it fell within a class of claims that

the Commissioner improperly denied.

On October 25, 1993, the Social Security Commissioner notified Johnson that her case

would be reopened pursuant to Bailey, and after the agency again denied her application,

ALJ Peter Train conducted a hearing on December 11, 1996.  (R. 27)  ALJ Train noted that

Johnson's insured status expired on September 30, 1986, and he analyzed whether she was

disabled before that date.  (R. 30)  Johnson testified that her job as a chain polisher required

that she lift thirty pounds of chain at a time, maybe more, and also required that she carry a

five gallon bucket of acid.  (R. 39-40)  The pain in her right arm developed because she had

to lift the five gallon bucket over her shoulder to pour it on the chain.  (R. 40)  At times, her

hand, wrist, and elbow would all hurt simultaneously and the pain would severely restrict her

activity.  (R. 41)  By the time of the 1996 hearing, her pain would not occur in all three areas

at the same time as frequently as it had when she was first injured.  (R. 41)  In 1980 and

1981, however, the pain was more severe, and in the general time period of 1980 through

1983, her pain was constant.  (R. 43- 44)  She explained that at some point after 1986 her

pain improved, and thus by the time of her 1996 hearing, her pain and limitations were not as

severe.  (R. 50-51)  After she stopped working in 1979, her husband performed household

chores such as cooking and washing the dishes, and her daughter would wash and iron her

clothes.  (R. 53)  After her husband died in 1983, she performed more chores, although the

additional work caused pain.  (R. 53)  She experienced pain sweeping the floor, running the

vacuum cleaner, wringing a rag, opening jars, opening doors, lifting, and carrying.  (R. 53-

55)  The pain, however, would vary in intensity  (R. 55)

On March 20, 1997, ALJ Train found that Johnson was not disabled at any point from

the onset of the injury on September 30, 1979 to December 19, 1983, the date of the Social

Security Commissioner's initial decision to deny benefits, which was found to be erroneous

in Bailey.  (R. 341)  He maintained that Johnson was not disabled because she could perform

her past relevant work as a chain polisher.  (R. 341-42)  He reasoned that Johnson's

impairments "improved considerably with surgery and physical therapy."  (R. 345)

> Treatment notes show minimal objective findings of impairment subsequent to
> late mid-1981, and two examinations performed in late 1983 revealed good
> strength and sensation in the arm with no evidence of muscular wasting.  In
> addition, the record shows [no] prescriptions or other form of treatment for the
> claimant's arm since 1981.  Morever, the claimant's treating physician, Dr.
> Butera, reported in October 1983 that the claimant could return to work at a job
> not requiring heavy lifting or pulling.

(R. 345)

ALJ Train then concluded that Johnson was able to perform her past work as a

chain polisher because she had submitted a vocational report in which she described

the job as requiring no lifting over ten pounds.  (R. 345)

On May 9, 1998, the Social Security Appeals Council reversed this decision, and

remanded the case to ALJ Train for further evidence.  (R. 360-61)  It explained that

Johnson's vocational report had severely underestimated the physical requirements of her

chain polisher position.  (R. 360)  The Council remanded to allow ALJ Train to obtain the

testimony of a vocational expert regarding the physical and mental requirements of Johnson's past relevant work.  (R. 361)

On September 4, 1998,  ALJ Train held a second hearing.  Johnson testified and described the physical requirements of her job as a chain polisher in great detail.  (R. 80-90) She then explained that she worked as a kitchen helper from 1990 through 1994, and then in 1994 worked in assembly inserting wires into connectors.  (R. 91)  She continued to work there until 1997, when she quit because the company began to require more complex work. (R. 93)  After she left that job, she went to work as a kitchen helper again.  (R. 95)  At the time of the hearing she was between jobs and looking for work.  (R. 97)  When she first was injured in the early 1980s, she was unable to perform the work required by any of these jobs because the pain was worse when she was initially injured.  (R. 100)  She explained that when Dr. Butera allowed her to return to work as a nurse's aide after her surgery in 1981, he shortly thereafter ordered her to cease this employment because it required lifting that he had not anticipated.  (R. 100-01)  In the early 1980s, Johnson could not hold her arm above her head to comb her hair or wash herself.  (R. 104)  Her husband helped her with her personal hygiene and household chores.  (R. 108)  After her husband died in 1983, she no longer had help with her daily activities and she had to use her arm more.  (R. 109)

Johnson's daughter also testified at the hearing.  She explained that she had to help her mother with her daily activities.  (R. 112-13)  When her mother was first injured and had her two surgeries, she had to help her mother with the laundry, take her to appointments, arrange her hair, clean her home, and wash her clothes.  (R. 112-13)  After Johnson's

husband died, her daughter increased her assistance.  (R. 114)  A year after Johnson's

husband's death, Johnson slowly became more proficient at caring for herself, and she

needed her daughter's assistance less. (R. 114-15)

Finally, Vocational Expert Jeannine Salek testified.  (R. 116)  ALJ Train asked her if

Johnson would be able to perform her past relevant work assuming that she was limited in

her ability to use her right dominant hand to perform heavy lifting in excess of twenty pounds

and could not strain with her right arm.  (R. 117)  VE Salek responded that she would be

unable to perform any of her past relevant work.  (R. 117-18)  Based on Dr. Butera's opinion

that she was partially disabled from April 17, 2001, VE Salek opined that Johnson was

unable to perform any of her past relevant work.  (R. 118)  VE Salek then found that Johnson

could perform other jobs in the national economy given her limitations.  (R. 120-22)  VE

Salek acknowledged, however, that Johnson would not be able to maintain any employment

if the pain in her arm caused her to miss more than twelve days of work per year.  (R. 128)

She further opined that if periods of increased pain forced Johnson to completely restrict the

use of her right arm, rather than just limit the use, Johnson would have been unable to

perform any job in 1983-84.  (R. 128-29)

On April 1, 1999, ALJ Train issued an opinion finding that Johnson was not disabled

because she was capable of performing a significant number of light jobs in the national

economy from September 30, 1979 to December 19, 1983.  (R. 13-18)  He reasoned

Johnson's complaints of pain were not entirely credible.  (R. 17)  He found that she could not

perform her past employment as a chain polisher, cook's helper, assembler, or factory

worker, but could perform other jobs.  (R. 17-18)

After the Appeals Council denied Johnson's appeal, she filed an appeal with the United States District Court for the Middle District of Pennsylvania.  (R. 5-6)  On December 16, 2002, the District Court remanded the case to the ALJ to re-analyze Johnson's credibility.  (R. 484-86)  The court found that ALJ Train did not sufficiently explain his credibility determinations and failed to consider testimony supporting Johnson's complaints.  (R. 486)

Upon remand, the case was assigned to ALJ Reana Sweeney, who scheduled a hearing for December 1, 2003.  (R. 500-03)  On November 30, 2003, Johnson's attorney sent a letter to ALJ Sweeney discussing the case and informing her that the alleged onset date of the injury was September 26, 1979.  (R. 522-23)

On December 1, 2003, Johnson, her daughter, Darla Lowe, Vocational Expert Jan Reed, and Medical Expert Dr. Stanley R. Asken testified.  ALJ Sweeney specifically limited the testimony of each witness to the period of May 1, 1982, to December 19, 1983.  (R. 404)  First, Dr. Asken testified that the two main physical impairments in the relevant period were de Quervain's disease and carpel tunnel syndrome.  (R. 408)  He found these conditions caused Johnson's pain and difficulty lifting and exerting with her right hand.  (R. 409)  He noted that, during the limited period in question, Johnson did not undergo any surgical procedures.  (R. 409)  Dr. Asken found that she could lift twenty pounds occasionally and ten pounds frequently if using both arms, and could lift ten pounds occasionally and five pounds frequently if using her right.  (R. 415)  He found no limitations as to handling or fingering, specifically stating "not in the relevant period."  (R. 417)

12

Johnson testified next, again recounting the physical requirements of her prior work experience including work as a home companion and chain polisher. (R. 432-39) She explained that her pain was constant in 1979, and when directed to focus in the period starting in 1982, she recounted that her pain at that time was constant but would vary in intensity. (R. 448) She also described tenderness in 1982. (R. 449) Her husband helped her with household chores in 1982 until he became sick in December of that year. (R. 452) While he was sick and when her daughter was unavailable, Johnson cooked for herself and her husband. (R. 452) She also would bathe him, dress him, and shave him when he was sick. (R. 451)

Johnson's daughter testified that she assisted her mother with household chores on the weekends and possibly once or twice during the week. (R. 456-57) She verified that when Johnson did too many activities during the day her arm would swell. (R. 465)

Finally, VE Reed testified that Johnson's past relevant jobs were home companion, chain polisher, sponger, bander and stamper, examiner, nurse's aid, and dish washer. (R. 474) He found that if Johnson had the residual functional capacity to perform light work, she would have been able to work as a companion, sponger, or a stamper and bander. (R. 475-76) However, if Johnson was limited to sedentary work, she would have been unable to perform any of her past relevant work. (R. 476-77) He then listed a number of other jobs in the economy that Johnson would have been able to perform given the hypothetical limitations proposed by ALJ Sweeney. (R. 477-83)

On January 9, 2004, ALJ Sweeney decided that Johnson could perform her past

relevant work as a pottery sponger and bander, and therefore, was not disabled.  (R. 400)

She found Johnson exaggerated the extent of her limitations.  (R. 397)  She reasoned that

Johnson was "doing well and had good use of the hand" by April 1981.  (R. 397)  Subsequent

visits in 1982 and 1983 showed good range of motion.  (R. 397)  She also noted that the

treatment in the period that she considered consisted solely of one injection and some

physical therapy.  (R. 397)  She gave significant weight to Dr. Butera's opinion in April 1982

that Johnson was able to perform light work as of April 1981. (R. 398)  She noted that

Johnson's daily activities included bathing and shaving her husband.  (R. 399)  Thus, she

found that the record established that Johnson was able to perform light work in the period

between May 1, 1982, to December 19, 1983.

### D.     Instant Appeal

The present case is Johnson's appeal of ALJ Sweeney's decision.  Johnson raised five

grounds on appeal before United States Magistrate Judge Thomas M. Blewitt.  First, she

argued that ALJ Sweeney erred in finding her only partially credible.  Second, she

maintained that ALJ Sweeney erred by failing to evaluate whether she suffered from reflex

sympathetic dystrophy.  Third, she contended that ALJ Sweeney erred in finding that she was

capable of sustained employment.  Fourth, she asserts she could not perform her past relevant

work.  Finally, she argues she cannot perform other work.

Magistrate Judge Blewitt proposes that we find that ALJ Sweeney erred by limiting

the relevant time period to May 1, 1982 to October 20, 1983.   He explained that ALJ

Sweeney limited her consideration to this time period because <u>Bailey</u> instructed that the

relevant review period on remand should begin from the either the date of the onset of the injury or seventeen months prior to the application, whichever was later.  Thus, ALJ Sweeney began her inquiry with May 1, 1982, seventeen months prior to Johnson's application, because this was the later date.  Magistrate Judge Blewitt correctly noted that Bailey qualified its explanation of the review period by stating, "in those Title II cases where beginning review at the earlier point in time would benefit the class member consistent with statutory and regulatory requirements, review will be done from that earlier point."  Thus, the proper relevant period began in September 1979 because using the May 1, 1982 date would exclude the period in which Johnson's impairment was most severe and her treatment most rigorous.  Magistrate Judge Blewitt found that this error affected the ALJ's decision, and warranted remand for further consideration.  Neither party disputes that ALJ erred and the correct relevant period dates back to September 1979.  Johnson, however, has objected to the proposal that we remand, and argues that we should direct Defendant to award benefits without remand.

## II.    Standard

In disposing of objections to a magistrate's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.  The judge may also receive further evidence or recommit the matter to the magistrate with instructions. Id.

15

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is less than a preponderance of the evidence, but more than a mere scintilla. Id.

## III.   Disability Definition

Disability is defined in the Social Security Act in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace. In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A). The Act further provides that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 459-60 (1983).

In the analysis of disability claims, the Commissioner employs a five-step sequential evaluation. 20 C.F.R. § 416.920. The initial three steps are as follows: 1) whether the

applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe

impairment; 3) whether the applicant's impairment meets or equals an impairment listed by

the Secretary of Health and Human Services as creating a presumption of disability.  If the

claimant cannot establish step three, she must demonstrate: 4) that the impairment prevents

the applicant from doing past relevant work.  See 20 C.F.R. §§ 404.1520, 416.920.  If the

applicant establishes steps one through four, then the burden is on the Commissioner to

demonstrate the fifth step, that there are jobs in the national economy that the claimant can

perform.  Jesurum v. Secretary of the U.S. Dept. of Health and Human Services, 48 F.3d

114, 117 (3d Cir. 1995).

### IV.    Discussion

Johnson objects to a remand for further proceedings.  She notes that she has been

embroiled in litigating this issue for over twenty-two years, her case has been remanded by

the district court twice already, the record is fully established, and at her advanced age further

delay could prevent her from receiving the benefits at all during her lifetime.  Defendant

argues that remand is necessary to determine whether the evidence from the period before

May 1, 1982 would affect Johnson's disability determination because substantial evidence in

the record supports the conclusion that Johnson was not disabled.

> A district court, after reviewing the decision of the Secretary may, under 42
> U.S.C. § 405 (g) affirm, modify, or reverse the Secretary's position with or
> without a remand to the Secretary for a rehearing.  The Court of Appeals also
> retains this discretion, and, in reversing or modifying the Secretary's position,
> may choose to remand to the Secretary for a further hearing or simply direct the
> district court to award benefits.

Podedworney v. Harris, 745 F.2d 210, 221-22 (3d Cir. 1984).

"The decision to direct the district court to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits." Gilliland v. Heckler, 786 F.2d 178, 184 (3d Cir. 1986). Once a claimant satisfies her burden to demonstrate that she can not perform her past relevant work, and the ALJ fails to develop the record to rebut the prima facie case, the district court need not remand and may direct the Commissioner to award benefits. See Woody v. Sec'y of Health & Human Svs., 859 F.2d 1156, 1162-63 (3d Cir. 1988) (directing the defendant to award benefits where the record contained substantial evidence of an impairment and the ALJ failed to rebut the claimant's well-developed prima facie case even though the extent of the claimant's day to day limitations from the impairment was undeveloped in the record); Rossi v. Califano, 602 F.2d 55, 58-59 (3d Cir. 1979) (directing benefits where the claimant had established she was unable to return to her prior work and the ALJ had failed to deduce contrary evidence or evidence of the possibility of alternative employment).

We find that remand is unnecessary and we will award benefits. Based on a fully developed record, Johnson established her prima facie case that she was disabled. When ALJ Sweeney limited her review to May 1, 1982 to October 20, 1983, she ignored the period where Johnson's impairment was most severe and her treatment most intense, and instead focused on a period after her condition had improved. The pre- May 1982 record includes Dr. Butera's notes of her office visits, pain treatment, and surgeries. The record includes the objective tests that were performed, the discharge notes from her operations, and the

18

transcripts of Johnson's and her daughter's testimony as to her limitations, as well as the testimony of a vocational expert.[9]

More important, the record contains substantial evidence that Johnson was disabled for at least a year. To establish a disability, a claimant must prove she is unable, "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death <u>or which has lasted or can be expected to last for a continuous period of not less than 12 months</u>." 42 U.S.C.A. § 423(d)(1)(A) (emphasis added). Defendant, like ALJ Train and Sweeney, relies on evidence of Johnson's prognosis subsequent to April 1981 to suggest that Johnson was not disabled. This evidence consists of Johnson's improved condition and lack of treatment following her second surgery. We find that this is not substantial evidence that Johnson was not disabled. Johnson's burden was to establish she had an impairment that lasted for a continuous period of not less than <u>twelve months</u>. It was not her burden to establish that she was disabled at all times. The evidence of improvement following the second surgery may be evidence that Johnson had a once disabling condition that later improved, but it is not substantial evidence that Johnson was never disabled in the first instance.

If a disabling impairment subsides after twelve months, the claimant is entitled to recover benefits for the period of time when she was disabled, known as a "closed period." <u>Mason v. Shalala</u>, 944 F.2d 1058, 1065 n.10 (3d Cir. 1993); <u>Chrapcula v. Heckler</u>, 829 F.2d

---

[9] Although ALJ Sweeney limited his focus to the period after May 1, 1982, ALJ Train's hearings included testimony on the earlier period.

1269, 1274-75 (3d Cir. 1987); see also Pickett v. Bowen, 833 F.2d 288, 289 n.1 (11th Cir.

1987) ("In a 'closed period' case, the decision maker determines that a new applicant for

disability benefits was disabled for a finite period of time which started and stopped prior to

the date of his decision.").  If the Social Security Commissioner awards benefits for a closed

period, it is her burden to prove, pursuant to 20 C.F.R. § 404.1594, that the disabled claimant

medically improved after the period in which she was disabled.  Chrapcula, 829 F.2d at

1274-75.  Thus, a claimant need not prove she was disabled at the time of the hearing to

recover benefits.  She need only prove she was disabled for twelve months, and if the

Commissioner finds she medically improved by the time of the decision, she can limit the

claimant's recovery to a closed period.  It is not the Commissioner's prerogative to deny

benefits altogether to a formerly disabled claimant merely because the claimant's condition

medically improved prior to the date of the decision.  As this case aptly illustrates, the time

lag caused by litigation can be considerable.  Thus, we look to the record to determine

whether Johnson established that she suffered an impairment that prevented her from

substantial gainful employment for at least twelve months.  We find that from the onset of

her injury in September of 1979, Johnson was disabled at least until her second surgery in

February of 1981, a period of sixteen months.

Johnson testified that in the early 1980s the pain in her right arm was so severe that

she could not raise it to comb her hair, brush her teeth, or wash herself.  (R. 104, 108)  She

could not turn her arm.  (R. 105).  Her husband had to perform these activities for her.  (R.

108)  She could not pull clothes over her head, so she had to wear a housecoat that snapped

down the front.  (Id.)  She had to use her left hand to fasten the buttons on her housecoat.

(Id.)  She could not use her hand to twist open jars.  (R. 109)  Turning a door handle was

difficult as well.  (R. 109)  Johnson's daughter testified that she had to wring out Johnson's

wash cloths, she did the laundry, she drove her to her appointments, and she took her to the

grocery store.  (R. 112)  During period of increased pain, Johnson could not brush her teeth

or comb her hair.  (R. 42)  In the early 1980s, these periods occurred almost constantly and

would last for six weeks at a time.  (R. 44)  During ALJ Train's second hearing, VE Jeannine

Salek testified that if Johnson's explanation of her pain and limitations was accurate, she

would not be able to perform any job.  (R. 129)  ALJ Train then concluded in April of 1999

that Johnson had been incapable of performing her past relevant work.  (R. 17-18)

      The medical evidence supports Johnson's description of her pain before her surgeries.

From the onset of her injury until April 1981, Johnson pursued an aggressive treatment

program.  She was diagnosed with de Quervain's disease, and carpel tunnel syndrome.  (R.

255, 253)  Each diagnosis was supported by objective medical tests.  (Id.)  A positive

Finkelstein test in February 1980 supported the de Quervain's diagnosis.  (R. 255)  A positive

test for Tinel's sign and a positive Phalen's maneuver in January 1981 supported the carpel

tunnel syndrome diagnosis.  (R. 253)  In the sixteen months following the onset of her injury,

Johnson received injections in her wrist, medication, and had two surgeries.  (R. 236, 238,

255)  In the first surgery on March 18, 1980, Dr. Butera found "definite thickening of the

retinaculum," and in the procedure he opened up the compartment in her wrist until the

compartment was "obviously free" and the tendons could glide without difficulty.  (R. 238)

During her second surgery on February 3, 1981, Dr. Butera identified the pathology causing her pain and surgically repaired the affected area. (R. 252)  He released tension on her traverse carpal ligament, and he released the synovial reaction around her nerve.  (R. 236)  Thus, Johnson's complaints of pain from 1979 through April 1981 were corroborated by her daughter, supported by identifiable medical diagnoses that were in turn supported by objective medical evidence, and supported by the aggressive treatment program she pursued during this time.  The record is entirely devoid of evidence suggesting that Johnson could return to her past relevant work from the onset of her injury until at least her second surgery.  No doctor opined that she could work during this period.  No doctor questioned her subjective complaints or the objective medical evidence in support thereof.  When ALJ Train considered the appropriate time period, he concluded that Johnson satisfied her burden.  VE Salek testified that Johnson's condition as she described it prevented her from performing any work, and given the limitation that Johnson could not lift twenty pounds, she would be unable to perform any of her past relevant work.  (R. 117-18)  Based on this evidence, ALJ Train found that Johnson could not perform her past relevant work.  When ALJ Sweeney found to the contrary, she relied entirely on evidence of Johnson's post-surgery prognosis and ignored the appropriate time period.  Thus, we find substantial evidence that Johnson was unable to perform her past relevant work for at least a year from the onset of her injury and find no need to remand to allow the Defendant to make a determination that ALJ Train has already made.

The change in her prognosis following her surgeries does not alter our conclusion.

Dr. Butera suggested that Johnson could perform light work in April 1981, but at no point prior to this did he suggest that she work, and this recommendation occurred only after two surgeries that he deemed successful.  In each surgery, Dr. Butera identified and remedied her the pathology that he believed caused her pain.  Furthermore, these surgeries altered her objective medical tests.  Prior to her surgeries, she tested positive for Finkelstein's test, Tinel's sign, and Phelan's test.  After her surgeries, these tests were all eventually negative. Additionally, her periods of increased activity occurred only after her second surgery, such as her three month employment as a nurse's aid in 1981 and the period in which she cared for her husband while he was sick in 1983.  Thus, the record establishes that her condition changed after her second surgery, and the fact that her surgeries and the passage of time altered her prognosis does not warrant a finding that she was never disabled in the first place, but may indicate that she was entitled to only a closed period of recovery.

V.    Conclusion

Therefore, we find no reason to remand for consideration of the evidence of Johnson's impairment prior to May 1982.  The record contains all of her medical evidence from that period, her description of her activities and abilities in that time, Vocational Expert Salek's determination of her residual functional capacity during that time, and even ALJ Train's determination that she was not able to perform her past relevant work.  Based on this record, Johnson satisfied her burden to demonstrate that she was unable to resume her past relevant work for at least one year.  We need not remand to provide Defendant with a fourth opportunity to sustain her burden to refute Johnson's prima facie case or establish medical

23

improvement, and we will direct the Appeals Council to award disability benefits.  We do not limit the amount of the award to the period from the onset of the injury until the second surgery.  We focused on this period merely to illustrate that Johnson established that she was disabled for at least twelve months.  Defendant has not demonstrated, pursuant to 42 U.S.C. § 423(f) and the eight step evaluation process in 20 C.F.R. § 404.1594(f), that Johnson's condition medically improved to the point where she could return to work in years immediately following her surgery.  We will not remand to allow Defendant yet another opportunity to satisfy this burden and we will direct the Social Security Commissioner to award Johnson benefits.

However, the record does establish, and Johnson admits, that she returned to work in the 1990s.  If she resumed substantial gainful activity, her disability ended.  20 C.F.R. § 404.1594(f)(1).  Thus, the Social Security Commissioner shall compute the benefits based on an onset date of September 30, 1979, an application date of October 20, 1983, and other factors provided by law, including but not limited to a possible termination date if Johnson's employment in the 1990s constituted substantial gainful activity and including offsets allowed by law for other benefits or earnings that Johnson received.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARTHA L. JOHNSON,** | : | **No. 3:04cv2504** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JOANNE B. BARNHART,** *Commissioner* | : | |
| *of Social Security***,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 28th day of February 2006, it is hereby **ORDERED** that:

1)      Plaintiff's Objection (Doc. 15) is **SUSTAINED**.

2)      The Report and Recommendation (Doc. 14) is **ADOPTED** in part.  To the extent that the Report and Recommendation finds that the Commissioner erred, it is adopted.  To the extent that it suggests that we remand rather than award benefits, we decline to adopt it.

3)      The Social Security Comissioner is directed to award benefits to Plaintiff Martha L. Johnson and to calculate the amount of benefits based on the onset date of September 30, 1979 and an application date of October 20, 1983.  It may also incorporate other factors as allowed by law into its computation, including but not limited to a possib`le cessation date if and when Johnson resumed substantial gainful employment and including offsets based on her receipt of other benefits.   This case is remanded to the Commissioner **SOLELY FOR THE PURPOSE OF CALCULATING THE AMOUNT OF BENEFITS DUE**.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**